**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**COURT FILE NO.: 1:16-cv-00825-PAB -KLM**

Devonn Ross, *on behalf of herself
and all others similarly situated,*

      Plaintiff,

v.

Convergent Outsourcing, Inc.
and LVNV Funding, LLC,

      Defendants.

___

**PLAINTIFF'S RESPONSE TO THERESA MATTHEWS'
AMENDED MOTION TO INTERVENE**
___

Plaintiff Devonn Ross ("Plaintiff") respectfully responds to the amended motion to intervene (Doc. 72) filed by Theresa Matthews ("Matthews).

**I.   Introduction**

Matthews is the fourth of seven individuals, together represented by eight attorneys from six different law firms, to seek intervention under Rule 24 in this action—all prior to the Court's decision whether to grant preliminary approval of the proposed class settlement and solicit input from the other class members. This is the definition of unnecessary clutter. Plaintiff refers the Court to Plaintiff's Response to Motions to Intervene (Doc. 74), in which she opposed intervention under Fed. R. Civ. P. 24 by Parmelee, Alexander, and Estrella, and expressly incorporates herein the arguments set forth in that response. Matthews presents no facts or circumstances that make her uniquely entitled to intervene as a matter of right or by permission.

Plaintiff submits this response to address a few specific issues raised in Matthews' motion.

1

**II.     Matthews misstates the contents of her own letters.**

In the factual background section, Matthews states that "[t]he letter did not contain *any language whatsoever* indicating that the debt was past the applicable statute of limitations, that Convergent or any other entity *would not sue* Matthews to collect upon the debt, or that *a partial payment* may restart the limitations period pursuant to state law." Doc. 72 at 4 (emphasis added).

Her *own filings* contradict this. *See* Doc. 72-1 at 3 (where letter states: "We cannot sue to collect this debt and providing a partial payment may revive the creditor's ability to sue to collect the balance."); *id*. at 5 (same). To be clear, Matthews *does* meet the definition of the class that Plaintiff seeks to certify. But this glaring error supports Plaintiff's argument that permitting any and all putative class representatives to intervene—by way of hastily filed motions by lawyers unfamiliar with their own clients' actions—will clutter the proceedings without providing any corresponding benefit to the parties or the Court. *See* Doc. 74 at 6-7.

**III.    The TILA's express limitation on statutory damages in a *series* of class actions does militate the use of small FDCPA class actions to maximize statutory damages.**

Matthews refers the Court to *Zimmerman v. Zwicker*[1] *& Assocs., P.C.*, No. CIV. 09-3905 RMB JS, 2011 WL 65912, at *6 (D.N.J. Jan. 10, 2011), which discussed the civil liability provision in the Truth in Lending Act ("TILA"). The TILA provision expressly limits liability "in any class action *or series of class actions* arising out of the same failure to comply by the same creditor." 15 U.S.C. § 1640(a)(2)(B) (emphasis added). The court noted that "[t]he FDCPA does not contain a reference to a 'series of class actions,'" and suggested that this "might indicate Congress' intent not to limit a defendant's exposure in FDCPA cases the same way it is limited in TILA cases." *Id*. at *7. But a closer look at the legislative history suggests the exact opposite.

---

[1] The motion incorrectly refers to the defendant in that case—a very large collection law firm—as "Wicker" & Associates, P.C. Doc. 72 at 9.

### A. The TILA did not contain the "series of class actions" language when Congress relied on it to create the FDCPA damages provision.

The TILA was enacted in 1968.[2] It originally lacked any class action damages limitation in the civil liability provision.[3] The limitation was added in 1974.[4] Statutory damages in class actions were originally limited to $100,000.[5] In 1976, this limit was increased to $500,000.[6] The FDCPA was not enacted until 1977.[7] The civil liability provision emulated the TILA's in all relevant respects, including the $500,000 limit on class damages.[8] It was not until 1980 that the "series of class actions" language was added to the TILA civil liability provision.[9]

Had Congress enacted § 1640 of the TILA and § 1692k of the FDCPA in their current forms as part of the same legislative process, it would be fair to apply to doctrine of *expressio unius est exclusio alterius* and presume that its omission of the phrase "series of class actions" in the FDCPA was intentional. But it did not. This is not a case where Congress used "particular language in *one section of a statute* but omit[ted] it in *another section of the same Act*." *Schendzielos v. Silverman*, 139 F. Supp. 3d 1239, 1244 (D. Colo. 2015) (quoting *Miljkovic v. Shafritz & Dinkin, P.A.*, 791 F.3d 1291, 1301–02 (11th Cir.2015)) (emphasis added).

The legislative history above indicates that Congress' intent in passing § 1692k of the FDCPA was to follow the civil liability framework of the TILA. Upon realizing that the language in TILA establishing aggregate liability was unclear, Congress amended it. *See* III.B, *infra*. It simply failed to amend the FDCPA to parallel the revised TILA provision. But there is nothing to

---

[2] *See* Pub. L. 90–321, title I, § 102, May 29, 1968, 82 Stat. 146.
[3] *See* Pub. L. 90–321, title I, § 130, May 29, 1968, 82 Stat. 157.
[4] *See* Pub. L. 93–495, title IV, §§ 406, 407, 408(a)–(d), Oct. 28, 1974, 88 Stat. 1518.
[5] *Id*.
[6] *See* Pub. L. 94–240, § 4, Mar. 23, 1976, 90 Stat. 260.
[7] *See* Pub. L. 90–321, title VIII, § 802, *as added* Pub. L. 95–109, Sept. 20, 1977, 91 Stat. 874.
[8] *See* Pub. L. 90–321, title VIII, § 813, as added Pub. L. 95–109, Sept. 20, 1977, 91 Stat. 881.
[9] *See* Pub. L. 96–221, title VI, § 615, Mar. 31, 1980, 94 Stat. 180.

infer from this failure. It is not as though the FDCPA was being amended around the same time, and Congress chose to amend the TILA, but not the same provision of the FDCPA. The FDCPA was not amended, in any way, until 1984.[10]  Simply put, Congress does not revisit the FDCPA very often. Most of its subsections are completely identical today as they were in 1977.[11] Because the TILA affects *creditors*—with whom most Americans interact on a regular basis—Congress revisits it frequently. The TILA's civil liability provision has been amended 13 times since its enactment, whereas the FDCPA's civil liability provision has only been amended once—and even then, merely to clarify that the Consumer Financial Protection Bureau was taking over administrative enforcement powers from the Federal Trade Commission.[12]

### B. Legislative history suggests the FDCPA's civil liability provision *was always* meant to create an aggregate limit.

In fact, a further inspection of the legislative history indicates that Congress' intent in 1976 was to create an aggregate statutory damages limit under the FDCPA—as the TILA clearly does today—not to provide multiple opportunities for subsets of consumers to obtain the same capped amount across several actions about the same violation. This is shown in the legislative history behind the 1980 TILA amendment, which added the "series of class actions" language. In the Senate Report's "explanation of the legislation," the provision was summarized as follows:

> Under the Act's current provisions, *there is the possibility* that a creditor could be subject to multiple class actions for the same violation, each seeking the maximum recovery of $500,000 or 1 percent of the creditor's net worth, whichever is less. This bill would *eliminate* that possibility *by assuring* that regardless of the number of class actions brought against a creditor for a particular violation, the creditor's maximum aggregate liability would not exceed the limits mentioned above.

S. Rep. 96–73, 1980 U.S.C.C.A.N. 280, 285 (emphasis added, all capitalization in original).

---

[10] *See* Pub. L. 98–443, § 9(n), Oct. 4, 1984, 98 Stat. 1708.
[11] *See* 15 U.S.C. § 1692; *Id.* at 1692b-d; *Id.* at 1692f; *Id.* at 1692h-j; *Id.* at 1692n.
[12] *See* Pub. L. 111–203, title X, § 1089(1), July 21, 2010, 124 Stat. 2092.

4

>The "section-by-section" analysis of the bill describes the amendment in greater detail:
>
>This section would also *eliminate ambiguity* as to a creditor's maximum liability in multiple class actions. Where several class actions are instituted against a creditor as a result of the same disclosure violation, *the bill makes clear* that the creditor's maximum aggregate liability could not exceed $500,000 or 1 percent of net worth, whichever is less. The committee believes the federal judiciary will determine through its own procedures how multiple class actions should proceed.

*Id*. at 295 (emphasis added, all capitalization in original).

Explaining that the amendment would "eliminate" the "possibility" of multiple damages award "by assuring" there would be a maximum aggregate limit strongly suggests that this was Congress' intent all along. By describing the amendment as designed to "eliminate ambiguity" and "make[] clear" how the class damages provision should be applied, Congress indicated that it viewed the original provision—after which the FDCPA's civil liability provision was modeled—as intended to have the same effect.

### IV.    A "claims made" settlement fund is justified here.

Matthews attacks Plaintiff's counsel for starting negotiations around the use of a "claims made" settlement fund. Doc. 72 at 13. In many circumstances, as here, a "claims made" fund is justified. *See In re Wells Fargo Loan Processor Overtime Pay Litig*., No. MDL C-07-1841 EMC, 2011 WL 3352460, at *8 (N.D. Cal. Aug. 2, 2011) (finding "a valid and substantial justification for the claims process").

In this case, the overwhelming majority of class members (over 98%) suffered no economic loss and would be recovering statutory damages only. As Matthews' motion explains, Doc. 72 at 9, dividing the statutory damages among all individuals would result in a paltry recovery ($.13), whereas a "claims made" fund means that *those who take the time* to submit a claim receive a not-

insignificant amount of money ($2.65).[13]  These are likely to be the same individuals who actually read Convergent's letter (or recall doing so) and found it vexing.

Moreover, the alternative approach results in two undesirable outcomes.  First, there is the very real concern that a substantial percentage of the settlement checks would never be cashed. *See In re Thornburg Mortg., Inc. Sec. Litig.*, 912 F. Supp. 2d 1178, 1233 (D.N.M. 2012) (approving settlement on the condition that "it provides for a second distribution of the uncashed checks to the Class members who cashed their checks in the first distribution").  Even if the class members' notice letter was not returned as undeliverable, the check may not actually reach the class member. Those class members who do not return a claim form might also not be motivated to cash a check for such a small amount.  *See id*.  Electing a distribution method that compensates those who submit claims, thus, ensures that checks are mailed to those who are likely to both receive and cash them. This avoids having a large portion of the fund go undistributed at the conclusion of the settlement—where the cost of a second distribution could exceed the funds to be distributed.

Similarly, electing a distribution process that requires mailing a notice letter *and* a settlement check nearly doubles the upfront postage cost.  Thus, the alternative method was so expensive as to prohibit a settlement with Convergent.  Plaintiff concluded that a "claims made" settlement—that still resulted in every class member in the United States receiving information about their rights—was preferential to no settlement at all.[14]

---

[13] These individuals are, in effect, being paid for having received a letter in the mail.

[14] From a practical standpoint, in the absence of this settlement, many of the Putative Intervenors were (and may still be) likely to settle with Convergent individually. Even if every state-wide class were certified, the majority of American consumers subjected to Convergent's practices would receive no benefit and no notice that they are not required to pay time-barred debts (being collected by Convergent or anyone else), or if they did, that they may bring an individual FDCPA claim to recoup their money. But neither Matthews nor any of the Putative Intervenors appear to have considered the benefits of expanding the class to all consumers in the United States.

With respect to those who made payments, and, therefore, could have a claim for actual damages, the alternative to a "claims made" settlement presented additional concerns. As described in Plaintiff's response to the earlier Putative Intervenors, Doc. 74 at 7, only 54,880 of the 3,761,584 consumers who received letters actually made payments. Unquestionably, many of them—and perhaps most—were misled into making payment. But it is likely that many paid for other reasons. In some cases, paying the debt could eliminate it from their credit report. *Cf. Midland Funding, LLC v. Johnson*, 137 S. Ct. 1407, 1414 (2017) (the fact that discharge meant debt would not remain on a credit report prevented a finding that submitting a claim on an obviously time-barred debt in Chapter 13 was *per se* unconscionable under § 1692f).

In other cases, paying the debt might repair their relationship with the creditor. While one of the letters Matthews received states that "Sprint may require partial or full payment" to "re-establish service," the letter regarding T-Mobile does *not* say this. *Compare* Doc. 72-1 at 4 *with id*. at 2. It may be that paying the debt would have enabled her to re-establish service at one or both of these wireless carriers. In other cases still, class members may have paid because they actually desired to resolve their debts and would have done so whether or not they knew that the debts were barred by the statute of limitations. *See McMahon v. LVNV Funding, LLC*, 744 F.3d 1010, 1020 (7th Cir. 2014) ("some people might consider full debt re-payment a moral obligation, even though the legal remedy for the debt has been extinguished").

A "claims made" settlement will increase the amount distributed to those actually deceived. Even in such a settlement, some class members who knew the debts could not be enforced—or with that information, would have made a payment anyway—could still submit a claim for reimbursement. But requiring a claim to be made reduces the number of such class members who share in the actual damages fund. The alternative—mailing a partial reimbursement to all paying

7

class members—meant that the most deserving class members (i.e., those who, realizing they were misled, would have submitted a claim) would have their reimbursement reduced by sending funds to class members who were not misled and/or would not asked for any reimbursement. Combined with the 'uncashed check' problem, a "claims made" settlement is a fair, reasonable, and adequate method of compensating those who made payments.

**V.      Matthews does not state what percentage reimbursement *would be* a fair compromise.**

Matthews suggests that Plaintiff is shown to be inadequate for initially negotiating a reimbursement in the range of 10-25%. Matthews contends that she seeks to intervene to contest the fairness of the settlement, but she does not state what range she believes is appropriate.

Obviously, Plaintiff could not have been expected to secure a complete recovery through a settlement. This is the best the class could do. Indeed, like the other Putative Intervenors, Matthews does not point to *a single case* where actual damages have been obtained (at trial or through settlement, on an individual or class basis) in an FDCPA action regarding time-barred debt, and Plaintiff is still unaware of any. The only precedent that exists on the issue—which was called to the Court's attention by *the existing parties*—is that something more than zero is required. *See* Doc. 56 at 18 (discussing *Rawson*, where the court denied approval for lack of any consideration of actual damages). Even for the strongest of class claims, the sheer risk involved in any litigation must persuade a court to approve a settlement that provides the class with something less than a full recovery. [15]

---

[15] To be sure, the Court *could* choose to deny the proposed settlement on any terms less than 100% reimbursement, finding that nothing less than a full restitution to all class members should be pursued at trial. But this would likely be reversed. *See Blankenbaker v. United Transp. Union*, 9 F.3d 116 (10th Cir. 1993) ("In exercising its discretion, the trial court *must* approve a settlement if it is fair, reasonable and adequate.") (emphasis added).

The question here is what percentage between nothing and everything is fair and reasonable enough to justify a compromise? Is it 90 percent? 75 percent? 50 percent? 25 percent? 10 percent? Matthews does not say. Nor does she explain how she would be in a better position to answer this penultimate question after conducting additional discovery into the "fairness" of the settlement.

For the past several years, counsel for Plaintiff and all of the Putative Intervenors have been engaged in a veritable war against this new business model of collecting on time-barred debts. Securing an agreement by one of the major actors in this fight to not only refund a portion of the payments it received, but *to put nearly 4 million consumers on notice* about this deceptive practice, must be viewed as a significant victory. It is unfair to cast Plaintiff or her counsel as somehow inadequate for finding it to be in the best interests of the class—and to ensure the broadest possible class—to establish this precedent.

## VI.  Matthews does not have a claim arising out of state law.

Matthews complains that the proposed settlement includes the dismissal of state-based claims arising out of the mailing of Convergent letters. But Matthews' complaint does not include a claim for any state law of Minnesota. *See* Doc. 72-2 *generally*. The undersigned is unaware of any state law that would entitle Matthews or consumers in Minnesota to relief under that state's laws, and she points to none.

## VII.  Conclusion

Matthews presents no different case than any of the other Putative Intervenors. For the same reasons addressed in Plaintiff's Response (Doc. 74), Matthews lacks any legitimate legal interest that will be placed at risk by being excluded from this action. She has failed to explain how her contribution will do anything but impede the Court's consideration of the proposed settlement. Like all other putative class members, she may exclude herself or object to the class settlement if the Court grants preliminary approval.

Dated: June 22, 2017

    Respectfully submitted,

    s/ David N. McDevitt
    David N. McDevitt (030761)
    Thompson Consumer Law Group, PLLC
    5235 E. Southern Ave., D106-618
    Mesa, AZ 85206
    602-845-5969
    866-317-2674 facsimile
    dmcdevitt@consumerlawinfo.com
    Attorneys for Plaintiff

**CERTIFICATE OF SERVICE**

I certify that on June 22, 2017, I electronically filed the foregoing Response to Theresa Matthews' Amended Motion to Intervene with the clerk of the U.S. District Court of Colorado, using the electronic case filing system of the court, which will send notification of such filing to all counsel of record, as follows:

Robbie Malone
Eugene Xerxes Martin
Robbie Malone, PLLC
8750 North Central Expressway, #1850
Dallas, TX 75231
rmalone@rmalonelaw.com
xmartin@rmalonelaw.com
*Attorneys for Defendants*
*Convergent Outsourcing, Inc.*
*and LVNV Funding, LLC*

Karen L. Kellett
KELLETT & BARTHOLOW PLLC
Texas Bar No. 11199520
11300 N. Central Expy., Ste. 301
Dallas, Texas 75243
Tel. (214) 696-9000
Fax (214) 696-9001
kkellett@kblawtx.com
*Attorney for Tamara Alexander*

David. J. Philipps
Mary E. Philipps
Philipps & Philipps, Ltd.
9760 South Roberts Road, Suite One
Palos Hills, Illinois 60465
(708) 974-2900
(708) 974-2907 (FAX)
davephilipps@ aol.com
mephilipps@aol.com
*Attorneys for Christine Parmelee, Jeremy*
*Vantuyl, and Sue E. Gill*

Brian R. Bromberg
Bromberg Law Office, P.C.
26 Broadway, 21st Floor
New York, NY 10004
(212) 248-7906
brian@bromberglawoffice.com
*Attorneys for Christine Parmelee*

Kelly D. Jones-Oregon Bar No. 074217
Kelly D. Jones, Attorney at Law
819 SE Morrison St., Suite 255
Portland, OR 97214
(503) 847-4329
Kellydonovanjones@gmail.com
*Attorneys for Jeremy Estrella*

Michael Fuller-Oregon Bar No. 093570
Olsen Daines PC
111 SW Fifth Ave., Suite 3150
Portland, OR 97204
(503) 201-4570
michaelfuller@gmail.com
*Attorneys for Jeremy Estrella*

Mark L. Vavreck, Esq.
MN Attorney I.D. #: 0318619
GONKO & VAVRECK PLLC
Designers Guild Building
401 North Third Street, Suite 600
Minneapolis, MN 55401
Telephone: (612) 659-9500
Facsimile: (612) 659-9220
mvavreck@cgmvlaw.com

Thomas J. Lyons, Jr., Esq.
MN Attorney I.D. #: 249646
CONSUMER JUSTICE CENTER, P.A.
367 Commerce Court
Vadnais Heights, MN 55127
Telephone: (651) 770-9707
Facsimile: (651) 704-0907
tommy@consumerjusticecenter.com

*Attorneys for Theresa Matthews*

Daniel A. Edelman
Edelman, Combs, Latturner & Goodwin, LLC
20 South Clark Street
Suite 1500
Chicago, IL 60603
Telephone: (312) 739-4200
Facsimile: (312) 419-0379
E-mail: dedelman@edcombs.com
courtecl@edcombs.com

*Attorney for Angel Cooley*

                                                  s/ David McDevitt
                                                  David McDevitt